## BARRON *v.* RICHARD *et al.* (*a*)

As to the effect and force of covenants against nuisances amongst after purchasers of adjoining lots, after the original vendor and vendee (who set the covenants running) have parted from their interest.

Under a covenant or proviso in a deed of city property not to carry on or permit " any livery stable, slaughter house, &c., or any other manufactory, trade or business whatsoever, *which should or might be in anywise offensive to the neighboring inhabitants :*" It was held, (upon the allegations in the bill) that a coal yard would be such an offensive trade as was contemplated by the covenant.

(*a*) Affirmed by the chancellor on appeal.

QUESTION of nuisance in using an adjoining lot as a coal yard.

In the year one thousand eight hundred and twenty-five, Thomas R. Mercein was the owner of a block of ground in the city of New-York, between McDougal street and the Sixth Avenue on the south side of Waverley Place, which he divided into thirty-nine building lots, and made a map, with such division, and filed it in the office of the register of deeds.

On the twenty-second day of March, one thousand eight hundred and twenty-five, Mercein sold and conveyed five of the lots to four different persons in severalty ; and in each of which conveyances the following condition was inserted : "Provided, however, and this indenture and the estate hereby granted are declared to be on this express condition, that there shall, at no time, be erected, made, carried on, permitted or suffered upon any part of the hereby granted premises, any livery stable, slaughter house, tallow chandlery, smith's shop, forge, furnace, brass or other foundry, nail or other iron factory, or any manufactory for the making of glue, varnish, vitriol, ink or turpentine ; nor for dressing or keeping skins or hides, or any distillery or brewery, nor any other manufactory, trade or business whatsoever which shall or may be in anywise offensive to the neighboring inhabitants ; and in default whereof, this indenture and every clause, article or thing herein contained shall become void to all intents and purposes."

Thomas R. Mercein subsequently sold more than twenty other lots in the same block to different persons ; and among them lot No. 11, subsequently purchased by the complainant, and also the lots Nos. 12 and 13, on which the defendants afterwards established a coal yard, and which coal yard caused the suggested nuisance.

The complainant, in his bill, insisted that he acquired, by conveyance, an estate in fee simple with a right in fee to all the privileges and advantages to the said lot and to the title and enjoyment thereof and was bound by and entitled to the benefit of the covenants in regard to the use and enjoyment of the lot and the contiguous lots. That the defendant Stephen Richard had no other title than what he obtained by means of the conveyance from Mercein (embracing the proviso against offensive trades.) The bill also showed that, in the city of

1837.

BARRON
*v.*
RICHARD.

*April* 26,
1837.

*Covenants.*
*Coal yard.*
*Nuisance.*

VOL. III.—13

New-York, building lots for dwelling houses were considered to be and were in fact much more valuable and would command a much higher price where the neighborhood was protected by conditions or covenants incorporated with the title and running with the land against nuisances and offensive trades. That the lots in question were situated in a pleasant, healthy and desirable part of the city for dwelling houses and fronted on pleasant streets, and, being exempted from noxious and offensive trades, were far more valuable than if coal yards and other offensive and filthy trades and kinds of business were established and conducted on parts thereof. That the complainant had erected a dwelling house of the first class on his lot at great expense. That the said defendant Stephen Richard had, by lease or contract with the other defendants William S. Popham and William S. Hill, authorized the latter to commence a coal yard on lots 12 and 13 ; and they had, accordingly, actually commenced it. And the bill, in reference to these lots, went on thus : " in which, during several successive months last past, they have daily received and still continue to receive coal of divers and many sorts ; and to break it up and screen or sift the coal so broken and separate the same from the dust : and they have there sold and continue to sell such coal and load it into carts, and to carry it away and to conduct the business with all the ordinary circumstances and practices usual in such business, and to occasion large quantities of the black, filthy, volatile, offensive dust and smut, usually incident to a coal yard where much business is done, to rise on the air and to be diffused around by the wind and into the premises of the neighboring inhabitants ; and, in spite of all the care which the neighbors can bestow, such coal dust and smut will settle on their walks, on their green sward, on their fragrant plants and flowers, beclouding the brightness and beauty which God has given to make them pleasant to the eye and cheering to the heart of man. They settle too on the neighbors' steps, thresholds and windows ; and enter into their out-houses, their dwellings, their carpets, their cups, their kneading-troughs, their beds, their bosoms and their lungs ; discolor their linen and their otherwise stainless raiment and robes of beauty and comfort ; deface their goodly furniture ; blacken, besmear and injure

every object of utility, beauty or taste ; and are thus offensive and injurious to all the neighbors who have regard for decency and cleanliness, so essential to the health and happiness of society ; and by reason of the immediate proximity of your complainant they are to him peculiarly offensive and injurious."

1837.

BARRON
v.
RICHARD.

The defendants put in a demurrer.

Mr. *W. H. Harrison* and Mr. *D B. Ogden,* for the defendants and in support of the demurrer.

Cases cited and works referred to : *Baines* v. *Baker,* Ambler, 158 ; 1 Mad. R. 128 ; *Attorney General* v. *Cleaver,* 18 Ves. 215 ; *Hills* v. *Miller,* 3 Paige, 254.

Mr. *C. Bushnell,* contra.

Cited : *Matter of Seventh street,* 1 Wend. 268 ; *In the matter of Lewis street,* 2 Ib. 473 ; *Jackson ex dem. Culverhouse* v. *Beach,* 1 John. Ca. 399 ; *Jackson ex dem. Ludlow* v. *Myers,* 3 J. R. 388 ; *U. S.* v. *Gurney,* 4 Cranch, 333 ; *Trustees of Watertown* v. *Cowen,* 4 Paige, 515 ; *City of Cincinnati* v. *The Lessee of White,* 6 Peters, 432 ; *Livingston* v. *The Mayor of New-York,* 8 Wend. 99, 105 ; *Beatty* v. *Kurtz,* 2 Peters, 566, 578 ; *Bleeker* v. *Bingham,* 3 Paige, 246 ; *Sir John Brett* v. *Cumberland,* Cro. Jac. 522 ; 4 Cruise's Dig. 65 : *Gardner* v. *Village of Newburgh,* 2 J. C. R. 164 ; *Van Bergen* v. *Van Bergen,* Ib. 272, 273 ; 1 Mad. Pr. 29, 133 ; *Seton* v. *Slade,* 7 Ves. 274 ; *Halsey* v. *Grant,* 13 Ves. 75 ; Mitf. 173 ; *Metcalf* v. *Hervey,* 1 Ves. 248 ; *In the matter of Hunter,* 1 Edwards' V. C. Rep. 1.

THE VICE-CHANCELLOR :—The great question is, upon the effect of the covenants in the deeds against offensive trades and business ; and, how far the complainant can avail himself of them ?

*April 3,*
*1838.*

This is an important question, not only as respects this particular property, but in regard to other parts of the city, where a large amount of real estate is held under deeds and leases containing similar covenants or conditions. The clause inserted in a few of the deeds executed by Mr. Mercein for the lots which he first sold, are in the form of conditions, the legal effect of which would be to defeat the estate granted, in case

of a breach of the condition; but no other person than the grantor or his heirs can, at law, take advantage of the condition and re-enter for a forfeiture or breach. In the subsequent deeds and those under which both the complainant and defendants held, this provision is introduced by way of covenant; and though it is expressed to be a covenant mutually made between the parties to the deed, their heirs and assigns, its only object can be to restrain the grantee and his heirs and assigns, and not the grantor and his heirs; for having sold and conveyed the fee simple of the lots, the grantor and his heirs can have no use or enjoyment of the property afterwards, and, therefore, no need of covenants on their part restraining them in the use or enjoyment. We are, therefore, to regard it as a several covenant of the grantee made to and with the grantor; but it is nevertheless a covenant "running with the land" and, as such, is binding, upon the heir of the covenantor and any subsequent purchaser under him, as assignee of the land: for the covenant follows the land, and becomes obligatory upon those who succeed to the same land, whether by descent or purchase: 2 Sugden Vend. 78; Platt on Cov. 461.

The object of these covenants, on the part of purchasers, and the reason for making it either a condition of the sale of each lot or for requiring such covenants, is very manifest. Mr. Mercein owned all the lots in the block, which, from their locality, were calculated for good dwelling houses and for forming a highly respectable neighborhood. In disposing of the lots, it was very important to him that the sale of one lot should not impair the value nor prejudice the sale of the rest; and hence he took care to lay the purchasers under the restriction contained in the covenants as to the use to be made of the lots; thus endeavoring to enhance their value and to encourage the erection of elegant houses, instead of suffering any of the lots to be depreciated by the introduction of stables or manufactories or business of any kind that might prove offensive or injurious to the character of adjoining lots or of the immediate neighborhood. In this respect, the covenants were to operate for the personal benefit of Mr. Mercein, while he remained the owner of any lot in the block; but if he has sold or should sell off every lot and part with all his interest in the

property, (and it does not appear by the bill how the fact is) then he would seem no longer to have any interest in the covenants, since, by a breach, which subsequently might be committed, he could not be injured. But the question is not now upon the continuing effect of the covenants in favor of Mr. Mercein or as to his rights and the remedies which he could pursue for a non-performance. The question now is, between the different grantees of Mr. Mercein in respect to their several lots, whether one of such grantees or a purchaser under him can claim any benefit of the covenant made to and with Mr. Mercein or can have any remedy against another grantee for a breach of such covenant? These covenants, upon their face, purport to include the "heirs and assigns" of both contracting parties. It has already been observed how far these covenants bind the "heirs and assigns" of the covenantor or purchaser, as covenants running with the land. They bind in respect to the particular lot conveyed, to which the covenant relates; but where is the land to which the covenant attaches itself in the hands of Mercein and follows upon his transfer or conveyance to a third person, so as to give that third person the benefit of the covenant, as his assignee? There is none. Selling one lot to A. in fee, and taking A's. covenant, restricting the use to be made of the lot, and then conveying an adjoining lot to B. upon similar terms, does not constitute B. the assignee of A's covenant. If Mr. Mercein, as the owner of land, had granted a term of years to A., taking his covenant as to the manner of using the land, and had then sold the reversion of the same land to B. in fee: here, the covenant of A. would follow the conveyance of the reversion to B., and the latter would be the assignee entitled to sue at law for a violation subsequent to his purchase. It is very obvious, that the present complainant does not stand in that situation, nor is he clothed with the legal rights of such an assignee.

I have met with one case bearing some analogy to the present—that of the *Duke of Bedford* v. *The Trustees of the British Museum*, in the 2d of Sugden on Vendors, app. 361, but no where else reported. There, the duke had become the owner of Southampton House, the former owner of which, in selling other ground on which the museum stood, had taken a covenant from the purchaser, that he, the purchaser, would

1837.

BARRON
v.
RICHARD.

not erect buildings on the ground conveyed to him to the north-ward of the line of Southampton House. Southampton House was afterwards pulled down; and on the side of it, adjacent to the museum gardens, houses had been built by the Duke of Bedford—and the question was, whether, in equity, he had a right to restrain the trustees of the British Museum from erecting buildings in the museum gardens to the northward of the *line* designated, contrary to the letter of the covenant. The vice-chancellor, before whom the cause was first heard, had difficulty in his own mind, as to the construction to be given to the covenant; whether it was a covenant intended to afford additional security for certain rents reserved out of the lands conveyed to the covenantor; and if so, then he appears to have considered that it was not a covenant running with the land not granted, that is, with the land upon which Southampton House was built, so as to give the subsequent owners of this land a right of action at law, as assignee of the covenant; and if no action at law could be sustained, then he considered there could be no remedy in equity.

Another view, however, was urged, as the one that might be taken of the covenant, *viz.* that it was intended not to se-cure the rents merely, but to prevent such a use of the land granted, as might tend to diminish either the valuable or plea-surable enjoyment of the land, adjoining on which Southamp-ton House was built. The vice-chancellor, therefore, stated the question to be, whether, upon the whole of the deed, it did appear that the covenants had been so framed, as to afford evidence of an agreement between the parties and those who should represent them, as being owners of Southampton House, on the one hand, and, on the other, as being owners of the land adjoining, that the latter would never use this land but in the manner prescribed, either to the prejudice or the profit or pleasure of Southampton House? If the deed af-forded evidence that such were the intentions of the parties to the instrument, then he said there was a clear remedy at law against the act sought to be performed and a clear remedy in a court of equity by way of injunction, to restrain the com-mission of that act. But a court of equity would only follow the law upon such an agreement and give the same construc-tion to it and merely restrain where a court of law could give

damages. He concluded to send the case to a court of law, to determine what the intention of the parties really was. On the hearing before Lord Eldon, it is stated that he ultimately decided, that, under the circumstances, considering the acts of the parties and the alteration of the property, &c., the right to relief in equity was at an end.

The grounds of Ld. Eldon's determination are not given, which, perhaps, is to be regretted; but, from the reasoning of the vice-chancellor in the case, it would seem that the principle on which that case proceeded was that the remedy in equity was to be graduated by the remedy at law upon the covenant or agreement and where no right of action at law could be traced to the party asking the injunction, he was not entitled to it.

It appears to me, however, that this is too narrow and limited a view to be taken of the powers and jurisdiction of the court in cases of this sort; and that, after all, the true doctrine which governs the case is to be found in *Hills* v. *Miller*, 3 Paige, 254, and in cases of that class.

With respect to the question, whether the business of a coal yard is an offensive trade or business or is among the number of things guarded against by the covenants, depends upon evidence. Enough is shown by the bill to bring it within the prohibition as a private nuisance, if not a public one. The defendant cannot, upon demurrer, gainsay the facts alleged in the bill. How far this court interferes to restrain a nuisance of any sort, I will not now inquire. Upon the ground of a privilege or easement created by the covenants, which it is competent for this court to protect the parties in the enjoyment of, and which constitute an equity in this bill, the demurrer must be overruled. Order accordingly. (*a*)

(*a*) In affirming this decision, Chancellor Walworth said: "There can be no doubt, if the allegations in the bill are true, that the use of lots 12 and 13 as a coal yard is a clear violation of the covenants of the grantees of those lots. The language of the covenant shows that several other uses of the lots far less offensive than this are, in terms, prohibited, on the ground that they would probably be offensive to the neighborhood. The allegation in the bill on this subject, though it is a little poetical, cannot be considered a mere poetic fiction, as it is sworn to by the complainant and is admitted by the demurrer." "Making all due allowance for the coloring which the pleader has given to this naturally dark picture, it is perfectly certain that this keeping of a coal yard upon any of these lots is a business offensive to the neighboring inhabitants according to the spirit and intent of these restrictive covenants."